UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 20-81689 |
| | ) | |
| Jerald W. Huston, | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | Judge Lynch |
| | ) | |

MEMORANDUM OPINION

If the holder of an allowed secured claim or the trustee objects to confirmation of a chapter 13 plan, the court "may not approve the plan" unless the plan either provides for payment of unsecured claims in full or provides "that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1). Additionally, the court shall confirm a chapter 13 plan only if "the plan has been proposed in good faith and not by any means forbidden by law." *Id.* § 1325(a)(3).

Now before the court is the chapter 13 Trustee's objection to confirmation of the Debtor's proposed plan on the basis of section 1325(a)(3). The issue of projected disposable income is intertwined throughout the Trustee's argument that the plan was not proposed in good faith. Specifically, the Trustee argues that it was bad faith for the Debtor to increase the 401(k) retirement contributions deducted from his salary by more than $1,000 per month less than a week before commencing a chapter 13 case that proposes a plan with smaller creditor payments as a result.

After trial,[1] the court finds that Debtor's proposed plan fails to either provide for all projected disposable income to be applied to allowed unsecured claims or to pay such claims in full.  Accordingly, the Trustee's objection will be sustained and the Debtor's request to confirm the plan will be denied.

## JURISDICTION

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  This matter involves confirmation of a bankruptcy plan and, therefore, is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

## FINDINGS OF FACT[2]

The Debtor, who is fifty years old, filed his petition under chapter 13 on September 30, 2020.  He is divorced, with no children, and owns a house which he schedules as worth $239,000, subject to a mortgage he schedules as $197,237.53. (ECF No. 1.)  He has been employed by Star Die Molding, Inc. for the past seven years and currently holds the title of Molding Manager.  The Debtor earns approximately $7,500 per month and his Form 122C-1 Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period, (ECF No. 3), and Form 122C-2 Chapter 13 Calculation of Disposable Income, (ECF No. 4), both state that he received gross wages of $7,561.00 per month during the six full calendar

---

[1] The hearing was conducted virtually via the zoomgov.com platform for good cause in compelling circumstances and with appropriate safeguards in accordance with Fed. R. Civ. P. 43(a), made applicable by Fed. R. Bankr. P. 9017, and this court's General Order No. 20-05.

[2] The following sets forth this court's findings of fact as required by Fed. R. Bankr. P. 7052.  To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

months before the petition date.  On an annualized basis, his average gross wages total $90,732, which exceeds the median family income in Illinois for a household of one ($54,877) as of the petition date.  The Debtor indicated in his Form 122C-1 that his applicable plan commitment period is 5 years, and his disposable income is to be determined under section 1325(b)(3) of the Bankruptcy Code.

**Listed Disposable Income and Filed Claims.**  Section 1325(b)(3) provides that for above-median debtors the amounts "reasonably necessary to be expended" and which may be deducted in the calculation of projected disposable income "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." 11 U.S.C. § 1325(b)(3).  Section 707(b)(2) limits amounts and types of expenses which may be deducted, primarily by reference to certain Internal Revenue Service guidelines.  In his Form 122C-2, the Debtor claims $5,814.25 in deductions allowed under section 707(b)(2)(A).[3]  Thus, before taking into consideration his 401(k) contributions, the Debtor's statement suggests that he would have $1,746.75 in monthly disposable income, or a total of $104,805, available for his plan over the course of the 60-month commitment period.  Before the applicable bar dates, thirteen unsecured creditors filed claims totaling $84,086.66.  One secured claim of $16,907.16, purportedly fully secured by the Debtor's vehicle, also was filed.  The

---

[3] The Debtor does not suggest that his actual expenses are significantly greater than his allowed deductions under section 707(b)(2)(A).  To the contrary, in his schedules I and J, asking for his estimated actual monthly income and expenses, ignoring 401(k) contributions, he lists gross monthly income of $7,561 less $2,114.26 in tax, medicare and social security withholding, less $195 in withholding for medical insurance, and less $3,503.03 in other expenses. (Ex. E, F.) This results in net monthly income ignoring 401(k) contributions of $1,748.72, which is very close to the $1,746.75 in disposable income ignoring 401(k) reflected in his Form 122C. In both his schedules I and J he marks that he does not expect any increase or decrease in actual income or expenses within the year post-petition.

Debtor's secured vehicle loan is already included within his section 707(b)(2)(A) expenses, and his proposed plan provides for the Debtor to continue paying the vehicle loan directly pursuant to the terms of the contract. He has no student debt. He has been divorced since 2011, has no children or dependents and has no obligations to pay maintenance, alimony or child support.

The Debtor's Retirement Plan. Star Die offers its employees a 401(k) plan but no pension. The Debtor has always made some form of contribution to the 401(k) plan during his employment at Star Die. For most of his employment, Mr. Huston contributed between $50 to $100 per month to the 401(k) plan and his employer made some matching contributions. However, during the six-month pre-petition period, the Debtor contributed an average of $75 per week, or $324.75 per month. His testimony revealed that after consulting with his bankruptcy counsel and less than one week before filing his chapter 13 petition, the Debtor further increased his contribution to the maximum annual allowable amount. The Debtor could not recall the exact figure but, in his words, he "just asked [his employer] to max it out." When asked to explain in his own words why he decided to increase his contribution, he testified that he "had nothing in retirement and 401(k) and nothing in the future to rely on but myself. And I had to think long term in a different way than I was doing before. And my attorney suggested that it could be done." On cross-examination, he further explained the increase: "My attorney suggested it, and I reviewed it, and I changed it." He also testified that he wanted to max out the contributions for that year "because I need to save for retirement and get as much as I can in my 401(k)."

In his Form 122C-2, the Debtor lists his increased 401(k) contribution of $1,495 per month to claim a deduction for what the form describes as "qualified retirement deductions." This deduction is listed at item 41 of the official form, which reads:

> 41. **Fill in all qualified retirement deductions**. The monthly total of all amounts that your employer withheld from wages as contributions for qualified retirement plans, as specified in 11 U.S.C. § 541(b)(7) plus all required repayments of loans from retirement plans, as specified in 11 U.S.C. § 362(b)(19).

(ECF No. 4.) The additional deduction brings the monthly disposable income that the debtor asserts in his Form 122C-2 down to $251.75 per month. (*Id.*) In part 3 of his Form 122C-2, the Debtor lists no anticipated change in income or expenses during the time the bankruptcy case has been or will be open. (*Id.*)

The parties have stipulated that as of the petition date the Debtor had contributed approximately $40,000 into his 401(k) account, and the Debtor testified that he has no other pension or any other 401(k) accounts or individual retirement accounts. The Debtor did not identify any major illness or disability that he now suffers or expects to suffer in the near future. While he stated that he had some minor health issues such as that his "knees aren't as good as they were when I was in my 20's and 30's" and that he "occasionally" has back pain, he also clarified that he only has "the same ailments as anyone else my age but maybe it's compounded from being in a factory forever." He testified that he is "fully able-bodied to do work at the moment." He testified that he has held his current position at Star Die since he began there seven years ago, both the job and the company are stable with no anticipated layoffs in the foreseeable future, and he hopes to work there until he retires. The Debtor testified that he has worked in molding for his entire working

life and identified no significant gaps in employment.  While he testified that he hopes to retire in approximately 15 years when he turns 65, on cross-examination he explained that he has no specific need to retire at that time.  He testified that he hopes to retire at "65 but in reality it might be 70 - it depends on how much is left to pay on my house, how much I have saved.  It all depends."

At trial, Mr. Huston testified that the primary reason why he had not saved more for retirement earlier was that he had hoped to move in with his mother in Florida and remain there if she needed assistance in her later years.  However, he inherited nothing when she died in April 2019, and his stepfather later severed ties with Mr. Huston.  The Debtor did not fully explain, if this was the principal reason for not contributing more earlier, why he waited almost a year and a half after his mother's death before he increased his 401(k) contribution in September 2020.  And while he testified that he did not fully realize he was being cut-off by his stepfather before they spoke in October 2019, the Debtor offered no real explanation for nearly a year elapsing from then before he increased his retirement contributions.  His failure to offer credible explanations for the delay after those events strongly indicate that the immediate, indeed primary, motivating factor for his actions was the discussions he had with his bankruptcy counsel shortly before he increased his contributions and filed his chapter 13 petition.  He testified that, until speaking with counsel, he "didn't realize that I could hit the reset button at 50 years old and invest in 401(k) for the future instead of spending the next two decades paying credit cards."

## DISCUSSION

1. The Means Test and Disposable Income Framework

"Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA or Act) to correct perceived abuses of the bankruptcy system." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 64 (2011) (citing *Milavetz, Gallop & Milavetz, P. A. v. United States*, 559 U.S. 229, 231-232 (2010)). The "heart of BAPCPA's consumer bankruptcy reforms," was the "means test," a statutory formula for determining "how much income the debtor is capable of paying" based on the Debtor's permitted deductible expenses as set forth in section 707(b) and by incorporation the definition of "current monthly income" in section 101(10A). *Id.* (citing H. Rep. No. 109-31, pt. 1, p.2 (2005)). The means test "supplants the pre-BAPCPA practice of calculating debtors' reasonable expenses on a case-by-case basis, which led to varying and often inconsistent determinations." *Id.* at 65.

The means test limits the court's discretion in certain ways. First, the definition of "current monthly income" is based on the average monthly income for the six calendar months preceding the petition date, rather than the rate as of the petition date or speculation as to the future. 11 U.S.C. §101(10A). Also, the term income is broadly defined, including that "from all sources that the debtor receives . . . without regard to whether such income is taxable income," and specifies only five categories of exclusion within the definition, for social security benefits, certain payments for victims of war crimes, crimes against humanity or terrorism, disability, combat-related injury or death of uniformed services members and payments related

to coronavirus disease 2019. *Id.* Second, expense deductions are limited, largely by reference to certain local and national standards issued by the Internal Revenue Service. *Id.* § 707(b)(2). Finally, the threshold for abuse is set, with a presumption of abuse if the calculation of disposable income suggests that the debtor would be able to pay unsecured creditors over a period of 60 months at least the lesser of (1) the greater of 25% of nonpriority unsecured claims or $8,175 or (2) $13,650. The implication of the means test is that it would be abusive for a debtor who could pay creditors at least such amount through a 60-month plan of reorganization in chapter 13 (or 11) out of future income to instead receive an immediate liquidation discharge in chapter 7 without devoting future income to payment of creditors. Corresponding changes were made by BAPCPA to the calculation of disposable income in chapter 13 to ensure that in chapter 13 "debtors will repay creditors the maximum they can afford." *Ransom*, 562 U.S. at 64.

"In Chapter 13 proceedings, the means test provides a formula to calculate a debtor's disposable income, which the debtor must devote to reimbursing creditors under a court-approved plan generally lasting from three to five years." *Id.* at 65 (citing 11 U.S.C. §§ 1325(b)(1)(B), (b)(4)). On objection to confirmation, the court "may not approve the plan" unless the plan either provides for payment of unsecured claims in full[4] or provides "that all of the debtor's projected disposable income to be received

---

[4] Because Section 1325(b) requires that as of the effective date of the plan "the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim," payment over time must include sufficient interest to encompass the time value of money to be distributed. *Till v. SCS Credit Corp.*, 541 U.S. 465, 477 (2004) (payment must include interest payments to "adequately compensate all such creditors for the time value of their money and the risk of default").

in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)."

Prior to BAPCPA, the Bankruptcy Code had only "loosely defined 'disposable income' as 'income which is received by the debtor and which is not reasonably necessary to be expended' for the 'maintenance or support of the debtor,' for qualifying charitable contributions, or for business expenditures." *Hamilton v. Lanning*, 560 U.S. 505, 509 (2010). While the phrase "projected disposable income" is not specifically defined, post-BAPCPA, the phrase "disposable income" is now defined as "'current monthly income received by the debtor' less 'amounts reasonably necessary to be expended' for the debtor's maintenance and support, for qualifying charitable contributions, and for business expenditures."[5] *Id.* at 510 (quoting 11 U.S.C. § 1325(b)(2)(A)). "Current monthly income" is specifically defined in section 101(10A) and is "calculated by averaging the debtor's monthly income during what the parties refer to as the 6-month lookback period, which generally consists of the six full months preceding the filing of the bankruptcy petition." *Id.*

Post-BAPCPA, the Bankruptcy Code also limits the phrase "amounts reasonably necessary to be expended" in section 1325(b)(2) for above-median debtors such as Mr. Huston to only permit specified expenses. *Id.* Section 1325(b)(3) states

---

[5] As part of the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, with a two-year sunset provision, section 1325(b)(2) also carves out certain payments related to the coronavirus disease 2019 national emergency from current monthly income for the purposes of determining disposable income. Pub. L. No. 116-136, § 1113, 134 Stat. 281 (2020). No issues relating to any payments related to COVID-19 are before the court in this matter.

that amounts reasonably necessary to be expended, other than charitable contributions, "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." 11 U.S.C. § 1325(b)(3). The permitted expenses specified in section 707(b)(2) set forth categories and amounts by reference to published Internal Revenue Service standards for the area in which the debtor resides. The debtor may only claim expenses that are "applicable" to him or her. *Ransom*, 562 U.S. at 80 (finding that local standard expense amount for transportation "Ownership Costs" was not "applicable" to a debtor "who will not incur any such costs during his bankruptcy plan"). Contributions to retirement plans are not included within the expenses listed in section 707(b)(2).

Thus, the determination of "disposable income" requires an analysis of "current monthly income" based primarily on the historical income for the six months pre-petition, together with, for above-median debtors, analysis of expense deductions based on the specified IRS standards for categories which are "applicable" during the plan period rather than actual expenses. However, the required payment itself is based on "projected disposable income." 11 U.S.C. § 1325(b)(1)(B). The Supreme Court has held that, while the historical period is the "starting point" for the calculation of "current monthly income," because the Code uses the term "projected," the "court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Lanning*, 560 U.S. at 520, 524.

2. Retirement Contributions

Prior to BAPCPA, the "great majority of courts . . . held under Section 1325(b)

that funds contributed to savings or pension plans constitute 'disposable income' that must be paid to creditors under a plan if the plan is to be confirmed." *N.Y.C. Emps.' Ret. Sys. v. Sapir (In re Taylor)*, 243 F.3d 124, 128-29 (2d Cir. 2001); *see also, e.g., In re McNichols*, 255 B.R. 857, 877 (Bankr. N.D. Ill. 2000) ("The clear majority view is that a voluntary contribution to a retirement plan is not a reasonably necessary expense and the amount of that contribution constitutes disposable income which must be applied to a debtor's plan under § 1325(b)(1)(B)."). They did so referencing "the clear language of the statute" as then written as well as the "perceived . . . inherent unfairness in a debtor paying himself by funding his own savings account, retirement plan, or pension fund while paying creditors only a fraction of their just claims." *Taylor*, 243 F.3d at 128-29. Other courts, such as the Second Circuit in *Taylor*, "opt[ed] for a more flexible solution," leaving it "within the discretion of the bankruptcy court judge to make a decision, based on the facts of each individual case, whether or not the pension contributions qualify as a reasonably necessary expense for that debtor." *Id.* at 129. *Taylor* suggested that the court could consider factors:

> including but not limited to: the age of the debtor and the amount of time until expected retirement; the amount of the monthly contributions and the total amount of pension contributions debtor will have to buy back if the payments are discontinued; the likelihood that buy-back payments will jeopardize the debtor's fresh start; the number and nature of the debtor's dependants; evidence that the debtor will suffer adverse employment conditions if the contributions are ceased; the debtor's yearly income; the debtor's overall budget; who moved for an order to discontinue payments; and any other constraints on the debtor that make it likely that the pension contributions are reasonably necessary expenses for that debtor.

*Id.* (footnote omitted).

The 2005 BAPCPA amendments, however, added section 541(b)(7). This section excludes certain withholdings and contributions to employee benefit plans from entering the bankruptcy estate and, through a disjointed hanging paragraph, also excludes such withholdings and contributions from constituting disposable income for purposes of section 1325(b)(2). Specifically, section 541(b)(7) excludes from "property of the estate" any amount (A) "withheld by an employer from the wages of employees for payment as contributions" to or (B) "received by an employer from employees for payment as contributions" to:

> (I)     an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;
> (II)    a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or
> (III)   a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986;

11 U.S.C. § 541(b)(7). Immediately following that language, a hanging paragraph states: "except that such amount under this subparagraph shall not constitute disposable income as defined in section 1325(b)(2)." *Id.* § 541(b)(7)(A)(i), (B)(i).

Since BAPCPA, courts have struggled with interpretation of this clause. The hanging paragraph states a category of "amounts" not to be treated as "income" solely for purposes of chapter 13, yet appears in a section applicable to all cases and describing what is and is not "property of the estate." Income and property are different and distinct concepts, and yet the phrase "such amount" in the hanging paragraph ties them together in an awkward manner. *See In re Hall,* No. 12 B 43452, 2013 WL 6234613, at *4 (Bankr. N.D. Ill. Oct. 22, 2013). As the *Hall* decision

describes it, "[i]n a sense, in drafting § 541(b)(7)(A), Congress jumped from point A to point C, conflating distinct and arguably unrelated concepts (*i.e.*, property of the estate and disposable income) without explaining the logical connection between the two." *Id.* (quoting Pernell W. McGuire, Aubrey L. Thomas, "401(k) Contributions Under Post-BAPCPA Case Law," 32-MAR Am. Bankr. Inst. J. 18, 19 (2013)). The prefatory words "except that" at the beginning of the hanging paragraph add to the difficulty of   reconciling these different concepts.

Some courts have interpreted section 541(b)(7) narrowly, as relating only to pre-petition withholdings and contributions and therefore not permitting deduction or exclusion of post-petition withholdings or contributions. *See, e.g., Parks v. Drummond (In re Parks)*, 475 B.R. 703 (B.A.P. 9th Cir. 2012). Other courts have held that it excludes all post-petition contributions, regardless of historical practice and even if the contributions commenced or changed post-petition. *See, e.g., In re Hall, supra; Baxter v. Johnson (In re Johnson)*, 346 B.R. 256 (Bankr. S.D. Ga. 2006). Others have taken a middle approach, permitting deduction but only if and consistent with the amounts contributed pre-petition — either as of the petition date, *see, e.g., In re Read,* 515 B.R. 586 (Bankr. E.D. Wisc. 2014), or during the six-month average "current monthly income" period, *see, e.g., In re Ahn-Thu Thi Vu,* No. 15-41405-BDL, 2015 WL 6684227 (Bankr. W.D. Wash. June 16, 2015).

Although a majority of courts appear to have adopted the broad approach permitting even contributions commenced post-petition, the only circuit court of appeals to have addressed the issue concluded that post-petition contributions are

excluded from disposable income only if commenced pre-petition. *See Penfound v. Ruskin (In re Penfound)*, 7 F.4th 527 (6th Cir. 2021); *Davis v. Helbling (In re Davis)*, 960 F.3d 346 (6th Cir. 2020).[6] Notably, in those cases the court found no need to choose between the petition-date approach or the 6-month CMI period approach. Because the few cases using the current monthly income approach are relatively recent, it is not surprising that approach does not appear to have been raised or addressed by courts in most of the published decisions on the issue. *See, e.g.*, *In re Whitt*, 616 B.R. 323, 327-30 (Bankr. S.D. Miss. 2020) (discussing the "three distinct approaches" and joining the "majority . . . that have held that postpetition retirement contributions are not considered disposable income," with no mention of the current monthly income approach).[7]

---

[6] In an unpublished opinion, the Fourth Circuit affirmed a bankruptcy court who permitted a debtor who had historically made TSP contributions, but was suspended from doing so for six months as of the petition date because of a TSP loan, to deduct from his projected disposable income future contributions in the historical amount once the suspension was lifted. *Gorman v. Cantu*, 713 F. App'x 200 (4th Cir. 2017). However, the trustee in *Cantu* had challenged only the bankruptcy court's factual determination that the plan was proposed in good faith, and did not "seek reversal on the ground that the [approach] adopted by the bankruptcy court is incorrect" or "urge [the court] to adopt some other identified standard." *Id.* at 203. Noting the split in authority over exclusion of voluntary retirement contributions from disposable income, the Fourth Circuit found that because the issue was not raised, the appeal "does not require that we resolve that statutory issue." *Id.* Additionally, both the bankruptcy court and the appellate court in *Cantu* highlighted that the debtor there had proposed only modest annual contributions "of approximately $3,200 [which was] well below the maximum allowable contribution of $18,000" at the time. *Id.* at 204.

[7] In *Whitt*, as in a number of the "majority" approach cases, the debtor was merely continuing retirement contributions in an amount consistent with pre-petition practice, and therefore both the majority and the two "middle" approaches would have had the same result. Indeed, the court, "[j]oining the majority view . . . holds that chapter 13 debtors may continue to contribute to a retirement plan and need not instead devote the income used for voluntary contributions to unsecured creditors through their chapter 13 plan." 616 B.R. at 331. But that description is equally applicable to the two middle approaches. *See also, e.g.*, *Hall*, 2013 WL 6234613, at *7 (acknowledging that, because the debtor commenced contributions pre-petition "it is not necessary to [decide between the majority and the petition-date approaches] for purposes of today's decision" before stating preference for the majority approach).

After close examination of the competing approaches, this court generally agrees with the analysis set out in *In re Anh-Thu Thi Vu*, 2015 WL 6684227, finding it to be the most consistent with the language of the relevant statutory provisions, the structure and concerns of BAPCPA and its means test, and the reasoning of the Supreme Court in *Hamilton v. Lanning*, 560 U.S. 505 (2010). This court agrees with *In re Anh-Thu Thi Vu* that section 541(b)(7) does exclude post-petition contributions, but because section 541(b)(7) refers to "disposable income as defined in section 1325(b)(2)" and not more broadly to "projected disposable income," this court must further conclude that the analysis should begin with a calculation based on the average six-month pre-petition income, excluding only average contributions made within that period. This court also concludes that in unusual cases the court may take into account other known or virtually certain information about the debtor's future income or expenses.

a.  Section 541(b)(7) Does Apply to Post-Petition Contributions.

No temporal limitation is found in the text of section 541(b)(7). *See, e.g, U.S. Trustee v. Kubatka (In re Kubatka)*, 605 B.R. 339, 363 (Bankr. W.D. Pa. 2019). Most decisions adopting the narrow approach, such as *Parks*, imply a time limitation from section 541(a)(1) or section 541(a)(6). As a general matter, subsection (a) describes what interests are property of the estate and subsection (b) sets forth exceptions to that rule by describing interests that are not included in the estate. But *Parks* starts by looking to subsection 541(a)(1), which includes in the estate "all legal or equitable interests of the debtor in property as of the commencement of the case," rather than

to section 541(a) as a whole, and concludes that "by reading § 541(a)(1) and § 541(b)(7)(A) together, the most reasonable interpretation of § 541(b)(7)(A) is that it excludes from property of the estate only those 401(k) contributions made before the petition date." 475 B.R. at 708.

The limiting phrase "as of the commencement of the case" in subsection (a) does not apply to other subparagraphs, so it would seem to be an oversimplification when *Parks* states that "§ 541 fixes property of the estate as of the date of filing." *Id.* at 707-08 (quoting *Seafort v. Burden (In re Seafort)*, 669 F.3d 662, 667 (6th Cir. 2012)).  For other subsections of section 541(a) do include property acquired post-petition, such as sections 541(a)(3) and (a)(4), which include property recovered by the trustee or preserved for the benefit of the estate under certain Bankruptcy Code sections, section 541(a)(5), which includes certain inherited and other property the debtor obtains within 180 days after the petition date, and sections 541(a)(6) and (a)(7), which include certain post-petition proceeds, product, offspring, rents or profits of property of the estate or other interests in property that the estate acquires post-petition. 11 U.S.C. § 541(a).  Thus, the fact that section 541 involves property of the estate does not mean that the section or the exceptions listed in section 541(b) apply only to interests in property the debtor owned as of the petition date.

Nor does the introductory portion of section 541(b) or any portion of section 541(b)(7) contain a temporal limitation or cross-reference to section 541(a)(1) or (6). This is in contrast to several subparagraphs of section 541(b) which do have time limitations.  For example, section 541(b)(5) and (6) except funds placed or contributed

to certain educational savings plans and tuition programs only to the extent contributed "not later than 365 days before the date of the" petition. 11 U.S.C. §§ 541(b)(5), (6).

Decisions such as *Parks* also emphasize the relationship between section 541(a)(6) and 1306 and the hanging paragraph's location within section 541 rather than 1306 to support their conclusion that the hanging paragraph applies only to pre-petition withholdings and contributions. *See, e.g., Parks,* 475 B.R. at 707 ("[W]e cannot ignore the relationship between § 541 and § 1306."). Section 541(a)(6) includes within the estate "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6). Section 1306, however, more broadly defines property of the estate for purposes of chapter 13, stating that property of the estate in chapter 13 cases:

> includes, in addition to the property specified in section 541 of this title—
> (1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first; and
> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first.

11 U.S.C. § 1306(a).

*Parks* reasons that because section 541(a)(6) includes in the estate only wages for services performed pre-petition, section 541(b)(7) as a functional matter only

"excludes" withholdings or contributions from wages earned pre-petition.[8] 475 B.R. at 708. The decision further infers from the hanging paragraph's use of the term "such amount" that it applies only to amounts described in section 541(b)(7) but which otherwise would be property of the estate under section 541(a)(6). *Id.* Yet, this is not clearly dictated by the statute. Section 541(b) and (b)(7) do not specifically reference section 541(a). Instead, section 541(b) simply describes what "[p]roperty of the estate does not include," 11 U.S.C. § 541(b), without specifying whether those exceptions apply only to property made property of the estate by section 541(a) or if the exception applies also to property made property of the estate through other sections such as section 1306.

Nor is section 1306 entirely clear that the exceptions within section 541(b) do not apply to property added to the estate by that provision. To be sure, that is implied by the phrase "in addition to the property specified in section 541 of this title." 11 U.S.C. § 1306(a). By referring to "section 541" rather than "section 541(a)," the provision suggests that property of the estate is to be determined first by looking to section 541(a), then to the exceptions in sections 541(b), (c) and (d), and then to the additional property added by section 1306. It would be rather oddly worded and structured if the legislature intended exceptions in 541 to apply to such additional property. On the other hand, to draw the conclusion that the failure to repeat all of section 541(b)(7) in section 1306 expresses legislative intent to exclude from the

---

[8] Section 541(b)(7)(A) by its terms only applies to withholdings from wages. However, section 541(b)(7)(B), which also includes a hanging paragraph, applies to payments "received by an employer from employees" for payment as contributions to a plan, without specifying wages as the source.

estate only pre-petition withholdings and contributions to employer retirement plans – particularly as regards the issue of disposable income – is not so apparent.  Section 1306 involves property of the estate, not the calculation of disposable income.  As such it is as unnatural of a place to place the hanging paragraph as section 541.

Additionally, even if the exclusion from the estate for amounts withheld or contributed were somehow limited to "amounts" withheld or contributed pre-petition, the court is not convinced that the "such amount" referenced in the hanging paragraph is so limited.  A reasonable interpretation of the hanging paragraph is that it refers to the *category* of amounts described in section 541(b)(7) rather than to specific property excluded from the estate.  This court cannot agree with the emphasis given to the clause "under this subparagraph" in the hanging paragraph, for example in *In re Seafort* , and its suggestion that if "all contributions to qualified retirement plans were excluded from disposable income, regardless of whether they were in effect as of the commencement of the bankruptcy case, the phrase 'under this subparagraph' would be superfluous. 669 F.3d at 673.  Given the way the hanging paragraph appears *between* section 541(b)(7)(A)(i) and (ii) (as well as between the same portions of section 541(b)(7)(B)), a more reasonable interpretation is that the phrase "under this subparagraph" refers to subparagraph (i), and thereby distinguishes its application from subparagraph (ii) excluding contributions to a "health insurance plan."  Since both subparagraph (i) and (ii) exclude a contribution "amount" from the estate, the phrase "under this subparagraph" is necessary to distinguish the type of contribution also excluded from disposable income.

Moreover, as noted by a bankruptcy treatise and several courts citing that treatise, limiting the hanging paragraph to funds contributed pre-petition "makes no sense, because any funds in the hands of the employer as of the chapter 13 petition date would never be considered to be disposable income, which only includes income received by the debtor after the petition is filed." 5 Collier on Bankruptcy ¶ 541.23 (16th ed. 2021); *see also, e.g., Whitt*, 616 B.R. at 330 (citing Collier).  Stating that it "makes no sense" is perhaps an overstatement.  Perhaps an argument could be made that if section 541(b)(7) applies only to prepetition contributions the hanging paragraph still functions to exclude from disposable income post-petition earnings on such contributions.  Many retirement plans provide for investment of and passive earnings on contributions and it is possible to argue that the provision was intended to exclude post-petition withdrawals of pre-petition contributions to the extent they were otherwise viewed as deferred income recognized once withdrawn post-petition.

But such arguments carry significant flaws.  If intended to cover post-petition earnings or proceeds, the statute could have said so.  Instead, it refers to the "amount . . . withheld by an employer from the wages" or "received by an employer from employees for payment as contributions," 11 U.S.C. § 541(b)(7), rather than the "proceeds, products, rents or profits" on contributions – terms the statute uses in section 541(a)(6).  And fear that post-petition withdrawals would be treated as "income" is inconsistent with the Bankruptcy Code's broad definition of current monthly income as including income "from all sources that the debtor receives . . . *without regard to whether such income is taxable income, derived during the 6-*

*month*" pre-petition period. 11 U.S.C. § 101(10A) (emphasis added). If the Bankruptcy Code already treats income based on when it is derived, there seems no need for concern about mischaracterization of deferred income which is derived pre-petition.

Some of the decisions adopting the narrow approach also point to section 1322(f), another provision added by BAPCPA, which provides that a "plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section 1325." 11 U.S.C. § 1322(f). That section provides an exception to the automatic stay for withholding wage income under a debtor's agreement for repayment of certain retirement plan loans. Some courts have concluded from it "that Congress did not intend to treat voluntary 401(k) contributions like 401(k) loan repayments, because it did not similarly exclude them from 'disposable income' within Chapter 13 itself." *Parks*, 475 B.R. at 709 (quoting *Seafort*, 669 F.3d at 672).

But like section 541(b)(7), section 1322(f) serves purposes other than exclusion from chapter 13 disposable income. Section 1322(f) prohibits modification of the terms of the loan, thereby protecting the retirement plan itself. Default in or modification of the terms of the loan could also potentially result in tax penalties for the debtor if they caused the loan to be recharacterized as an unqualified distribution. This could in turn increase the number of claims against the estate and thereby decrease the amount available to other creditors. That modification of terms through a chapter 13 plan applies only to chapter 13, and therefore the provision naturally

belongs in chapter 13 in the section detailing what a chapter 13 plan may and may not do. Unlike repayment of a loan, whether or not a debtor chooses to make new contributions to a retirement plan involves no modification of claims or rights of others through a plan, so the hanging paragraph in section 541(b)(7) would not belong in section 1322. True, section 1325 would appear to be a more logical place for provisions affecting what is and what is not disposable income for purposes of section 1325. But Congress did not include the plan loan repayment provision in section 1325, either. So little should be read into the lack of treatment of new contributions in section 1322(f) where it does not belong. Both the hanging paragraph and section 1322(f) expressly refer to section 1325, and thus section 1322(f) furnishes yet another example of modifying treatment of disposable income in section 1325 by adding a cross-reference to section 1325 elsewhere rather than by amendment to section 1325 itself.

Finally, *Parks* and other cases find as "[f]urther support" for their conclusion that the hanging paragraph does not apply to withholdings or contributions from post-petition income that the "reasonable and necessary expenses" under the means test set forth in § 707(b)(2)(A) and (B) (and incorporated by section 1325(b)(2)) set forth detailed categories of deductible expenses but do not include retirement contributions. 475 B.R. at 709 (citing *Seafort*, 669 F.3d at 672; *Egebjerg v. Anderson (In re Egebjerg)*, 574 F.3d 1045, 1052 (9th Cir. 2009)). But that is beside the point. Under section 1325(b)(2), "disposable income" is current monthly income minus exclusions listed in section 1325(b)(2) minus allowable expense deductions.

Withholdings and contributions to employee retirement plans are not excluded under the definition of current monthly income, under section 1325(b)(2)'s exclusions, or under section 707(b)(2)(A) and (B)'s expense deductions. They are excluded because that is what the hanging paragraph in section 541(b)(7) expressly directs. If those amounts were already excluded as "reasonable and necessary expenses" in § 707(b)(2), then there would be no need for the hanging paragraph at all. *See, e.g., Hall*, 2013 WL 6234613, at *10 ("But whether any case or guideline provides that contributions to voluntary retirement plans are a necessary expense is a red herring. We are never faced with the question of whether 401(k) contributions are a necessary expense because those contributions do not constitute disposable income in the first place.").

Thus, the court agrees with both the majority approach and the two middle approaches to the extent they recognize that section 541(b)(7) is not limited to pre-petition withholdings or contributions, and that that section excludes at least some post-petition retirement plan withholdings from section 1325(b)(2)'s calculation of disposable income.

b. Section 541(b)(7) Generally Only Permits Exclusion of Withholdings Similar to those Taken During the Six Months Pre-Petition.

As discussed above, the hanging paragraph in section 541(b)(7) provides that the referenced withholding or contribution amounts "shall not constitute *disposable income* as defined *in section 1325(b)(2)*." 11 U.S.C. § 541(b)(7) (emphasis added). Section 1325(b)(2) defines "disposable income" for purpose of that subsection as current monthly income received by the debtor (other than certain specified

categories of excluded income, including for example certain child support payments), less amounts reasonably necessary to be expended as described therein. *Id.* § 1325(b)(2). "Current monthly income" in turn is defined as the average monthly income from all sources that the debtor actually received, including amounts paid on a regular basis for the debtor's household expenses, during the six calendar months preceding the petition date. *Id.* § 101(10A).

Putting these provisions together shows that section 541(b)(7)'s hanging paragraph means that withholdings from income for employer retirement plans are to be excluded in determining disposable income. But, because the formula looks only to the income during the six months pre-petition, it also only excludes withholdings during the same period. The reason future withholdings should be ignored while analyzing past income is clearest in situations where both withholdings and gross income increase after the calculation period. For example, if a debtor had an average income of $100 per month during the current monthly income period and withheld 10%, or $10 per month during that period (assuming for simplicity no other expenses or deductions to disposable income), then the debtor's disposable income for purposes of section 1325(b)(2) is $90 per month, even if the debtor obtained a raise on or just before the petition date to $400 per month and planned to withhold $40 per month for a retirement plan out of future income. It would be mixing apples and apple seeds for the debtor to argue that his disposable income was only $60 by subtracting post-petition contributions from pre-petition average income. While the $40 per month planned withholding might be relevant to "projected disposable income" under section

1325(b)(1), just as the increased monthly post-petition salary might be, section 541(b)(7) references only section 1325(b)(2)'s "disposable income."

The court in *Hall* noted that other courts had similarly emphasized the distinction between the terms "disposable income" used in section 541(b)(7) and "projected disposable income" used in section 1325(b)(1), but concluded that the "argument is weak." 2013 WL 6234613, at *8.[9] The discussion in *Hall* is likely *obiter dicta*, as the debtor there had not made any change to the amount of contributions, meaning that "Hall's disposable income is the same as her projected disposable income." *Id.* ("In our case, there are no significant changes to Hall's financial circumstances.")  Nonetheless, in downplaying the significance of section 541(b)(7)'s reference to "disposable income" and "section 1325(b)(2)" the court noted that the term "'projected disposable income' is not defined anywhere in the Code, and in fact a decision of the U.S. Supreme Court was required to provide clarity." *Id.*  The court also compared the treatment of post-petition repayment of retirement plan loans and found "no compelling reason to favor payment of retirement loans over contributions." *Id.*

But while both provisions were added by the same amendment, the language of section 1322(f) excluding repayments of retirement plan loans is notably different from the language of the hanging paragraph in section 541(b)(7) excluding

---

[9] However, elsewhere in the opinion the court in *Hall* does acknowledge and apply the framework set forth by the Supreme Court starting with the mechanical determination of "disposable income" as the basis for the forward-looking determination of "projected disposable income."  2013 WL 6234613, at *8 ("To make the leap to *projected* disposable income – all of which must be applied to make payments to unsecured creditors under the plan when an objection to confirmation is raised – we start with the calculation of disposable income." (citing *Hamilton v. Lanning*, 560 U.S. 505 (2010))).

withholdings for new contributions.  Section 1322(f) more broadly states that loan repayments "shall not constitute 'disposable income' under section 1325" – referring to the entire section.  In contrast, section 541(b)(7) states that new contribution withholdings "shall not constitute disposable income as defined in section 1325(b)(2)" – referring to the specific subsection and the specific definition therein, which defines the term by reference to current monthly income.  Nor does this court agree with the suggestion that there is no reason to distinguish between loan repayments and new contributions.  As noted above, loan repayments may have an impact on the retirement plan itself, which may have invested the original contribution, and may have tax implications if default or modification of the loan terms causes recharacterization of the loan as an early distribution.  Through continuation of payment of a retirement plan loan, a debtor "may avoid default on the loan and any related tax penalties." 3 Collier on Bankruptcy ¶ 362.05 (16th ed. 2021).

This is not to say that section 541(b)(7)'s hanging paragraph is not at all relevant to "projected disposable income."  Projected disposable income is based on "disposable income."  But the first step in determining the future-looking "projected disposable income" is to determine the past-looking and mechanical "disposable income."  In *Lanning,* the Supreme Court noted that "a person making a projection uses past occurrences as a starting point" and agreed that the past-looking "disposable income" was the starting point for determining "projected disposable income." 560 U.S. at 520.  The Court thus concluded that a bankruptcy court has discretion to "account for changes in the debtor's income or expenses that are known

or virtually certain at the time of confirmation." 560 U.S. at 524.   But *Lanning* involved matters that were virtually certain but outside of the debtor's control – a one-time buyout from the debtor's former employment during the six-month current monthly income period that artificially inflated her calculation of disposable income but was unlikely to reoccur.   *Lanning,* therefore, did not address a situation where the debtor had control over the amount of future income or expenses.   However, the Court did warn that it is "only in unusual cases that a court may go further and take into account other known or virtually certain information about the debtor's future income or expenses." *Id.* at 519.   In this way, the Court concluded, "the phrase '[f]or purposes of this subsection' in § 1325(b)(2) is not rendered superfluous by the forward-looking approach." *Id.* at 519 n.5.

The six-month lookback period used in the calculation of current monthly income and disposable income is part of the means test device mandated by Congress in BAPCPA.   As to what place remains for non-standardized income and expenses under the means test, the Supreme Court explained that, "[i]n eliminating the pre-BAPCPA case-by-case adjudication of above-median-income debtors' expenses, on the ground that it leant itself to abuse, Congress chose to tolerate the occasional peculiarity that a brighter-line test produces." *Ransom*, 562 U.S. at 78.   Similarly, using actual income during the six-month pre-petition period, at least as the starting place, for determining a debtor's future ability to pay can reduce reliance on purely speculative predictions of future income or expenses, but also can make it more difficult for a potentially abusive debtor to game the system. *Cf., e.g., Layng v.*

*Urbonas (In re Urbonas)*, 539 B.R. 533, 548 (Bankr. N.D. Ill. 2015) (noting debtor took a nearly six-month hiatus from his high-paying job as a medical doctor which corresponded nearly perfectly with the six-month lookback period for the means test before resuming same position soon after filing chapter 7 petition).

In numerous provisions, the Bankruptcy Code recognizes that debtors in bankruptcy or at the edge of insolvency may not have proper incentives to act because they are essentially "playing with creditor's money" or may attempt to game the system. The Bankruptcy Code addresses this concern by permitting a trustee to avoid certain preferential or fraudulent transfers made on the eve of bankruptcy. *See* 11 U.S.C. §§ 547, 548. Similarly, the Code discourages strategic changes in residence on the eve of bankruptcy to take advantage of another state's more generous exemptions by its choice-of-law provision triggered by a change in residence within 730 days before the petition date. *See* 11 U.S.C. § 522(b)(3)(A).

Where the debtor drastically increases his retirement withholdings on the eve of bankruptcy or post-petition and then seeks a lower plan payment based on those withholdings, it raises concern that the motivating factor is the diversion of plan payments from creditors rather than a legitimate need for retirement savings. Even under the majority approach, most courts have acknowledged "potential abuse" of that approach "is easily forestalled by the requirement of § 1325(a)(3) that plans must be 'proposed in good faith.'" *Hall*, 2013 WL 6234613, at *11. As the court noted in *In re Shelton*, "BAPCPA expressly limited the application of § 541(b)(7) to one particular paragraph, § 1325(b)(2)" and thus Congress did not "intend[] to handicap the courts'

good faith inquiries or unintentionally create a proverbial 'loophole.'" 370 B.R. 861, 867 (Bankr. N.D. Ga. 2007).

There may be significant overlap between the factors courts espousing the majority view have used in determining whether it is "good faith" under the circumstances of the case to propose lower plan payments due to increased post-petition retirement plan contributions and the factors to be used under *Lanning's* projected disposable income test. But a significant difference between the two standards is the initial burden. At least some courts adopting the majority approach have suggested under the good-faith standard that post-petition commencement of retirement contributions, standing alone, does not establish that the debtors have not proposed their plan in good faith. *See, e.g.*, *In re Jones*, No. 07-10902-13C, 2008 WL 4447041 (Bankr. D. Kan. Sept. 26, 2008). In contrast, under the standard based on *Lanning* this court now adopts,[10] where a debtor proposes a lower plan payment based on increased retirement plan contributions rather than the average disposable income reflected in the six-month current monthly income period, the burden will be on the debtor to justify the deviation from the presumptive showing of disposable income under the means test.

3. <u>Whether the Debtor Has Satisfied the Projected Disposable Income Test.</u>

The parties stipulate that the Debtor contributed to his 401k in the amount of

---

[10] In addition to the discretionary standard for determining "projected" disposable income under *Lanning,* the court makes no determination today whether or in what circumstances "special circumstances" under section 707(b)(2)(B), as incorporated by section 1325(b)(3), might permit allowance for increased retirement contributions under the initial analysis of "disposable income."

$75 weekly ($324.75 monthly) from March 5th to September 17th, 2020. (ECF No. 40 ¶ 13.)[11] They further stipulate that the Debtor first "increased his 401k contribution to $346 weekly ($1498.18 monthly)" starting with the paystub of September 24, 2020. (*Id.* ¶ 14.) Since the Debtor was paid weekly and his petition was filed in September 2020, the current monthly income to be considered for confirmation does not include any income from September 2020 and any pay increase he may have then received is not relevant to the initial mechanical determination of "disposable income."

The Debtor's Form 122C-1 lists the Debtor's average gross wages before deductions to be $7,561.00 for the applicable period. From the evidence presented at trial, this figure appears to correspond to the 26 weekly paystubs that he received from March 5, 2020 through August 27, 2020. Each of those paystubs listed a gross weekly base pay of $1,691.00.[12] The Debtor's calculations also appear to include a $1,400 bonus received on March 5, 2020.[13] The Debtor claims in his Form 122C-2 $5,814.25 in expense deductions not including 401(k) contributions, to which the Trustee has not objected. Thus, the court finds for purposes of section 1325(b)(2) that

---

[11] This timeframe does not perfectly match the statutory period for determining disposable income under section 1325(b)(2), which is March 1, 2020 through August 30, 2020. However, it has not been alleged that the Debtor's contributions for March 1-4 or September 1-17 were materially different.

[12] Both the week before and the week after those weeks covered by the 26 paystubs show the same gross weekly base pay, and therefore a slightly different calculation based on when the income was "derived" would not materially alter the calculation of average gross monthly income, which the Trustee has not opposed.

[13] The parties stipulate that the Debtor received a second bonus on September 17, 2020, of $5,050.00, which was received outside the current monthly income period. Finding, based on the Debtor's deduction for increased withholdings, that the proposed plan fails to provide for all projected disposable income, the court need not address whether the second bonus should be included in the calculation of either disposable income or projected disposable income. In any event, that issue may already be addressed by the plan term providing for a portion of future bonuses to be contributed to the plan for distribution to creditors.

the Debtor's disposable income is $1,422, which consists of his gross average monthly income of $7,561 minus average monthly 401(k) contributions of $324.75 minus $5,814.25 in expense deductions.

The Debtor argues that his projected disposable income should be adjusted downwards by an additional $1,173.43 to reflect his additional 401(k) contribution of $1,498.18 withheld from his paycheck.  It is not disputed that this increased withholding began the week before he filed his chapter 13 petition, and the court accepts his representation that he has and intends to continue to make this additional contribution to his 401(k) account from his wages.  The chapter 13 plan before the court for confirmation proposes to make payments to the trustee of $252.00 per month for 56 months and $644.00 per month for an additional four months, totaling $16,688.00, for distribution to administrative expenses and unsecured creditors.  The plan provides for base payments totaling less than a fifth of his $85,320[14] in disposable income over the course of 60 months.

The Debtor is 50 years of age, but he has not shown or even identified any health or other issues impairing his ability to work in the same or similar capacity as his present employment in the near future or until retirement age.  Mr. Huston testified that he has approximately $40,000 in current retirement savings.  While he noted that such savings are less than half his current annual salary, he provided no

---

[14] $85,320 is 60 times $1,422.  The Debtor proposed a step-up to his monthly payment of $392 for the last four months, presumably to correspond with his anticipated completion of a scheduled car loan at that time.  The court makes no finding at this time whether a plan providing a monthly payment of $1,422 would similarly need a step-up, or whether completion of the loan is already accounted for by amortization of secured debt expenses in section 707(b)(2)(A)(iii).

details as to how those savings are invested, whether or how much he is likely to be entitled to in social security benefits at retirement or his likely needs and expenses when he retires. He testified that he would like to retire at 65 but offered no reasons for why he could not work longer if necessary, acknowledging that depending on his financial and other circumstances he may have to work longer. He also gave no evidence that he was restricted from or otherwise unable to contribute more to retirement earlier other than by his own choice. Instead, his only explanation for not making greater contributions earlier was his now-dashed hopes that his mother would provide for him in retirement, through inheritance or otherwise. Mr. Huston currently maintains a household of one and owns his own home. He does not contend that anyone other than himself is likely to depend on his savings during his retirement.

It is undisputed that the Debtor drastically changed his voluntary contribution behavior after seeing bankruptcy counsel and on the eve of filing his petition. He asked to increase his contribution withholdings more than fivefold less than a week before filing his bankruptcy petition.

In the plan under consideration, Debtor proposes to pay his general unsecured creditors approximately 15% of their allowed claims. In contrast, were the Debtor's plan based on his disposable income after deducting for an amount reflecting his average retirement contributions during the applicable six-month period, it appears that more than 88% of allowed claims might be paid.

Based on the evidence presented at trial, the court finds that the Debtor failed

to demonstrate circumstances warranting such adjustment under the standard set forth by the Supreme Court in *Lanning.* It further finds that the Debtor has not established that his "projected" disposable income is materially different from his disposable income as calculated pursuant to the means test and deducting average monthly contributions to his employer retirement plan during the current monthly income period. As the Debtor's proposed plan fails to provide for all projected disposable income received during the plan period to be contributed to payment of allowed unsecured claims and the proposed plan payment is insufficient to pay those claims in full, the trustee's objection will be sustained and confirmation denied.

## CONCLUSION

The Trustee's objection will be sustained, and confirmation of the Debtor's plan filed on January 11, 2021 (ECF No. 25) will be denied. The Debtor will be given leave until November 1, 2021, to file an amended plan consistent with the court's determinations. The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order will be entered giving effect to the determinations reached herein.

DATE: September 30, 2021        ENTER:

Thomas M. Lynch
United States Bankruptcy Judge